United States District Court
Southern District of Texas
**ENTERED**
March 16, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| MARIA CRISTINA LOPEZ, | § | |
| GUADALUPE DEL ROSARIO LOPEZ, | § | |
| JOSE MAURILIO LOPEZ, and JUAN | § | |
| LUIS LOPEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 7:03-CV-00320 |
| | § | |
| PAMELA BONDI, ATTORNEY | § | |
| GENERAL OF THE UNITED STATES, | § | |
| and UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The case is before this Court to resolve a genuine issue of material fact as to whether Maria Cristina Lopez Perez, Guadalupe Del Rosario Lopez Perez, Juan Luis Lopez Perez, and Jose Maurilio Lopez Perez (collectively, "Plaintiffs") have established by a preponderance of the evidence that they were born in Donna, Texas, on February 12, 1969, December 12, 1972, November 3, 1973, and July 31, 1976, respectively, and thus, are United States citizens.

**I.     FINDINGS OF FACT**

The Court finds that the following facts have been established by a preponderance of the evidence.  Any finding of fact that should be construed as a conclusion of law is adopted as such.

A.      MEXICAN BIRTH CERTIFICATES[1]

### 1.      Maria Cristina Lopez Perez

1.      On April 23, 1969, the Civil Registry of the Government of the State of Tamaulipas, Mexico, issued a birth certificate for Plaintiff Maria Cristina Lopez Perez. (Dkt. No. 148-1 at 9–15).

2.      The birth certificate lists the date and location of Maria Cristina's birth as February 12, 1969, at 10:15 am in Ejido La Reforma, Tamaulipas, Mexico.  (*Id.*).

3.      Evangelina Perez and Maurilio Lopez-Ornelas, Maria Cristina's parents, were present when the birth certificate was issued.  (*Id.*).

### 2.      Guadalupe Del Rosario Lopez Perez

4.      On November 26, 1973, the Civil Registry of the Government of the State of Tamaulipas, Mexico, issued a birth certificate for Plaintiff Guadalupe Del Rosario Lopez Perez.  (*Id.* at 17–23).

5.      The birth certificate lists the date and location of Guadalupe's birth as December 12, 1972, in Ejido La Reforma, Tamaulipas, Mexico.  (*Id.*).

6.      Evangeline Perez and Maurilio Lopez-Ornelas, Guadalupe's parents, were present when the birth certificate was issued.  (*Id.*).

### 3.      Juan Luis Lopez Perez

7.      On November 26, 1973, the Civil Registry of the Government of the State of Tamaulipas, Mexico, issued a birth certificate for Juan Luis Lopez Perez.  (*Id.* at 25–31).

8.      The birth certificate lists the date and location of Juan Luis's birth as November 2, 1973, at 6:00 am in Ejido La Reforma, Tamaulipas, Mexico.  (*Id.*).

9.      Evangelina Perez and Maurilio Lopez-Ornelas, Juan Luis's parents, were present when the birth certificate was issued.  (*Id.*).

### 4.      Jose Maurilio Lopez Perez

10.     On September 4, 1978, the Civil Registry of the Government of the State of Tamaulipas, Mexico, issued a birth certificate for Jose Maurilio Lopez Perez.  (*Id.* at 33–38).

---

[1]      Evangelina and Maurilio did not register Plaintiffs' two siblings—Gabriela and Angelica—in Mexico. (Dkt. No. 160 at 114).

11.     The birth certificate lists the date and location of Jose Maurilio's birth as July 31, 1976, at 5:00 am in Rio Bravo, Tamaulipas, Mexico.  (*Id.*).

12.     Evangelina Perez and Maurilio Lopez-Ornelas, Jose Maurilio's parents, were present when the birth certificate was issued.  (*Id.*).

### B.     BAPTISMS/TEXAS DELAYED BIRTH CERTIFICATES

13.     On October 11, 1981, all six of Maurilio and Evangelina's children (Plaintiffs and their sisters Angelica and Gabriela) were baptized at a Methodist church in Donna, Texas.  (*Id.* at 39–50).  At the time, they were living in Weslaco, Texas.  (*Id.*).

14.     Evangelina and Maurilio testified that they baptized their children so that the Baptism Certificates could be used to obtain Texas Delayed Certificates of Birth, which they could then use to attend school in the United States.  (Dkt. No. 160 at 41–42); (Dkt. No. 161 at 32, 35).  Evangelina also testified that the children were baptized as "a religious decision."  (Dkt. No. 161 at 35).

15.     On October 12, 1981, the next day, Plaintiffs Guadalupe, Juan Luis, and "Maurelio,"[2] as well as their sister Gabriela, all obtained their first immunizations from the same clinic.  (Dkt. No. 148-1 at 242–43).  Their sister Angelica received her first immunizations four days later.  (*Id.*).  They all also received their second immunization on January 4, 1982, at the same clinic.  (*Id.*).

16.     On November 6, 1981, Evangelina, using the abovementioned Baptismal Certificate and her own affidavit that she generated on October 21, 1981, obtained a Texas Delayed Certificate of Birth from the Hidalgo County Clerk stating that Plaintiff Maria Cristina was born to her and Maurilio in Donna, Texas, on February 12, 1969.  (*Id.* at 40).  This document was generated more than twelve years after Maria Cristina's birth.

17.     On January 24, 1983, Evangelina, using the abovementioned Baptismal Certificate and her own affidavit that she generated on December 3, 1982, obtained a Texas Delayed Certificate of Birth from the Hidalgo County Clerk stating that Plaintiffs' sister Gabriela was born to her and Maurilio in Donna, Texas, on August 3, 1975.  (*Id.* at 50).  This document was generated more than seven years after Gabriela's birth.

18.     On May 21, 1982, Evangelina, using the abovementioned Baptismal Certificate and her own affidavit that she generated on March 30, 1982, obtained a Texas Delayed Certificate of Birth from the Hidalgo County Clerk stating that Plaintiff Guadalupe was born to her and Maurilio in Donna, Texas, on December 12, 1972.  (*Id.* at 42).  This document was generated more than nine years after Guadalupe's birth.

---

2     Plaintiff Jose Maurilio's name is listed only as "Maurelio" on his immunization record.  (Dkt. No. 148-1 at 43).

3

19.     On August 2, 1982, Evangelina, using the abovementioned Baptismal Certificate and her own affidavit that she generated on June 25, 1982, obtained a Texas Delayed Certificate of Birth from the Hidalgo County Clerk stating that Plaintiff Juan Luis was born to her and Maurilio in Donna, Texas, on November 3, 1973.  (*Id.* at 44).  This document was generated more than eight years after Juan Luis's birth.

20.     On February 5, 1982, Evangelina, using the abovementioned Baptismal Certificate and her own affidavit that she generated on January 27, 1982, obtained a Texas Delayed Certificate of Birth from the Hidalgo County Clerk stating that Plaintiffs' sister Angelica was born to her and Maurilio in Donna, Texas, on August 2, 1971.  (*Id.* at 48).  This document was generated more than ten years after Angelica's birth. [3]

21.     On February 15, 1983, Evangelina, using the abovementioned Baptismal Certificate and her own affidavit that she generated on January 14, 1983, obtained a Texas Delayed Certificate of Birth from the Hidalgo County Clerk stating that Jose Maurilio was born to her and Maurilio in Donna, Texas, on July 31, 1976.[4]  (*Id.* at 46).  This document was generated more than six years after Jose Maurilio's birth.

## C.     FOOD STAMPS CONVICTION

22.     In July 1985, Evangelina was indicted by a Grand Jury in Hidalgo County, Texas, of intentionally, knowingly, and unlawfully appropriating $1,105 in food stamps from September 12, 1983, through May 8, 1984.  (*Id.* at 115).

23.     On October 24, 1985, a summons was issued for Evangelina to appear at the Hidalgo County District Court on November 1, 1985, for her trial for the felony offense of Theft of Food Stamps over the value of $200 and under the value of $10,000.  (*Id.* at 119).  The State of Texas also announced that it was ready for trial in October 1985.  (*Id.* at 121).  Evangelina Lopez was also informed that, on November 1, 1985, she would have to enter a plea of "guilty" or "not guilty" and be prepared to proceed.  (*Id.* at 123).

24.     On November 1, 1985, a bond for Evangelina was set at $500 and she also had to pay fees of $16.  (*Id.* at 125).

---

[3]     Because Angelica and Gabriela do not have Mexican birth certificates—unlike Plaintiffs—the Government does not contest that they are United States citizens.  (*See* Dkt. No. 215 at 42) ("In this case, because the Government never had the birth records from Mexico of [Angelica and Gabriela], it could not meet its initial burden to establish alienage.  That's why that case—the cases against them did not proceed.").

[4]     Plaintiff Jose Maurilio's Texas Delayed Certificate of Birth lists his name only as Maurilio. (Dkt. No. 148-1 at 46).

25.     On November 13, 1985, Evangelina pled guilty of the felony offense of Theft of Food Stamps over the value of $200 and under the value of $10,000 and requested a Deferred Judgment.  (*Id.* at 129).

26.     That same day, the Hidalgo County District Court accepted Evangelina's guilty plea and entered an Order Deferring Further Proceedings and Placing Defendant on Probation.  (*Id.* at 131–32).

27.     Evangelina was ordered to pay a total of $2,267 in restitution at a rate of $32.00 per month commencing on December 10, 1985.  (*Id.* at 132).

D.     TRIAL TESTIMONY

1.     Testimony of Yolanda Hernandez

28.     Yolanda testified that, since she was born, she has lived on her family property, Rancho Viejo, in Donna, Texas.  (Dkt. No. 181 at 5).

29.     Her adopted parents were Apolonio and Andrea Jackson.  (*Id.* at 6).  She also has two adopted brothers, including Apolonio Jackson, Jr.  (*Id.* at 7).

30.     Yolanda met the Lopez Perez family through her parents when she and Plaintiffs' parents were young.  (*Id.* at 8).  Her family raised cattle and took them to the Rio Grande River (which abutted Rancho Viejo) to drink.  (*Id.*).

31.     Maurilio Lopez-Ornelas—Plaintiffs' father—and his brothers lived on the Mexican side of the Rio Grande and would offer to help the Jackson family with the cattle.  (*Id.* at 8–9).

32.     According to Yolanda, around this time (the early 1960s) the Rio Grande was passable on foot.  (*Id.* at 9–10).  She stated that the river would come up to her waistline or chest height.  (*Id.*).  She was around 11 years old at the time.  (*Id.*).

33.     In addition to crossing the river to help the Jackson family, Maurilio and his brothers would also play in the river with Yolanda and bring her to the Mexican side.  (*Id.* at 10-11, 15–17).

34.     She claimed that she and Maurilio had a "very close relationship" as children but that she had not seen him in a while.  (*Id.* at 62).

35.     Rancho Viejo was around a quarter of a mile from the riverbank.  (*Id.* at 12).

36.     The Lopez Perez family lived "not at the [Mexican] riverbanks, but . . . closer south."  (*Id.*).

37.     Many people living on the Mexican side would cross into the U.S. and ask to help the Jackson family with their cattle. (*Id.* at 12–15).  In exchange, Andrea Jackson would give the volunteers food grown at the ranch. (*Id.*).  Yolanda was not sure whether these volunteers were ever paid. (*Id.*).

38.     Yolanda first met Evangelina Perez after she married Maurilio, around 1968. (*Id.* at 17).

39.     The first time Evangelina came to Rancho Viejo pregnant was in 1969. (*Id.* at 18).  Evangelina went to the ranch a few days before she gave birth and was accompanied by Maurilio and a midwife that she believed was named Nina. (*Id.* at 21–22).  Yolanda estimated she would arrive less than a week, give or take, before the birth. (*Id.* at 67).

40.     During the birth of Evangelina's first three children—Maria Cristina, Angelica, and Guadalupe—Yolanda would be sent out of the house because she was unmarried and it was culturally taboo for her to be present for the births. (*Id.* at 29, 46–47).

41.     Yolanda claimed that none of Evangelina's children were born at night and that they were all born on the weekend or during the summer when she would not be in school. (*Id.* at 30–31).

42.     When Juan Luis was born, Yolanda's mother—whom Yolanda claims assisted with all the births—wanted her to see the birth but she refused out of a concern for Evangelina's privacy. (*Id.* at 32).

43.     Yolanda never personally observed the birth of Evangelina's children. (*Id.* at 71).

44.     She stated that Maurilio, Plaintiffs' father, was not in the room for the children's births but was at the ranch. (*Id.* at 74–75).  Later, she contradicted herself and said that there were times that Maurilio brought Evangelina to the ranch and then went back to Mexico when she gave birth. (*Id.* at 80).

45.     After Evangelina gave birth, she and Maurilio would stay at the ranch for a day or two and then return to Mexico with the child. (*Id.* at 34–35).

46.     Yolanda never actually saw them walk across the river but assumed they did. (*Id.* at 63–64).  Sometimes they would walk back through the river and other times they would be given a ride by someone. (*Id.*).

47.     Yolanda did not know the height of the river on the day of Plaintiffs' births. (*Id.* at 65).

48.    Yolanda stated that she saw all six of Evangelina's children at the ranch immediately following their births.  (*Id.* at 35–36).

49.    She claimed not to know why Evangelina would come to the ranch to give birth.  (*Id.* at 36–37).

50.    Evangelina would give birth in Yolanda's mother's bed and Yolanda would share her bed with her mother.  (*Id.* at 37–38).  Both beds were in the same room.  (*Id.*).

51.    Yolanda remembered that it was hot on the day of Gabriela's birth and that her mother told her to gather the washcloths that were to be used during the birth.  (*Id.* at 49–50).

52.    She remembered Jose Maurilio's birth because it was before the birth of her own second child in July and the family was getting ready to set off fireworks for the Fourth of July.  (*Id.* at 50–51, 52–53).

53.    She remembered helping with the washcloths and water for Juan Luis's birth and remembered hearing him cry.  (*Id.* at 51–52).

54.    Yolanda claimed that her mother did not help Evangelina with "the paperwork or whatever" to register the children in the United States.  (*Id.* at 54).

55.    Yolanda did not know much about the midwife that assisted with the births besides the fact that she was in her fifties and was driven to the home once.  (*Id.* at 54–56, 75).

56.    She did not know whether the midwife was paid for assisting with the births.  (*Id.* at 69).

57.    Yolanda stated that when she gave birth to her own children, she did so either in a clinic or a hospital.  (*Id.* at 72).

58.    She also remembered Maurilio and Evangelina crossing the river with their children to attend an Easter celebration held on the U.S. side of the river.  (*Id.* at 88–89, 98–101).

### 2.    Testimony of Evangelina Perez[5]

59.    Evangelina testified that she was born and raised in El Ejido La Reforma Municipio, Rio Bravo, Tamaulipas, Mexico. (Dkt. No. 160 at 67–68).

60.    Her parents' home was a less than 20-minute walk from the Rio Grande River. (*Id.* at 68). As a child, she would often bathe and swim in the river. (*Id.* at 68–69). She considered herself a good swimmer. (*Id.* at 69).

61.    Evangelina met the midwife that helped with Plaintiffs' births when she was doing agricultural work in the United States. (*Id.* at 70). The midwife lived in El Ejido and offered to help with Evangelina's first birth when she saw that Evangelina was pregnant. (*Id.* at 70–71).

62.    Evangelina did not know whether the midwife was a registered midwife. (*Id.* at 71). Evangelina stated that they would pay her whatever they could, usually around 100–150 pesos. (*Id.* at 115).

63.    Evangelina did not believe that the midwife helped anyone else in El Ejido give birth. (Dkt. No. 161 at 77).

64.    Evangelina stated that it would not have been appropriate to give birth in her home, her parents' home, or Maurilio's parents' home because they were all small and crowded with family and had no electricity or running water. (Dkt. No. 160 at 71–72). It would also be difficult to give birth in town (Rio Bravo) because it was far away. (*Id.* at 73).

65.    As a result, she and Maurilio decided that she should give birth at the Jackson family ranch in the United States after Andrea Jackson offered because it had electricity and running water. (*Id.* at 72).

66.    Evangelina stated that she would cross the river to visit Andrea Jackson every other weekend. (*Id.* at 74). She never had any problems crossing the river. (*Id.*).

67.    For Maria Cristina's birth, Evangelina left for the Jackson ranch around two days before she gave birth when she began to experience pain. (*Id.*). She and Maurilio walked across the river for Maria Cristina's birth. (*Id.* at 74–75). Maurilio then went back across to bring the midwife over. (*Id.* at 75).

---

[5]    Near the end of Evangelina's testimony, it was implied that she had been taking hypertension medication that may have affected her memory. (Dkt. No. 161 at 95–111); (Dkt. No. 214 at 50–56).

68.      At the ranch, Andrea Jackson lent her room to Evangelina, which only had one bed.  (*Id.*).  Evangelina stated that Yolanda and Andrea slept together in another bedroom.  (*Id.*).

69.      Evangelina stated that Andrea and Apolonio Jackson drove her back to Mexico the day after she gave birth to Maria Cristina.  (*Id.* at 76).

70.      Evangelina also crossed the river to the Jackson ranch for Guadalupe's birth.  (*Id.*).  Because the water level was high at the time, she crossed in an inner tube.  (*Id.* at 76–77).[6]

71.      Evangelina stated that she would leave for the Jackson ranch around two days before she gave birth to each of her children.  (*Id.* at 116).  This contradicted her earlier deposition testimony where she stated she would travel to the ranch around one to two weeks before giving birth.  (Dkt. No. 161 at 81).

72.      After Guadalupe's birth, Evangelina was driven back home by one of Andrea Jackson's nephews.  (Dkt. No. 160 at 77).

73.      Evangelina also crossed the river to the Jackson ranch for Juan Luis's birth.  (*Id.* at 78).  Because the water level was high at the time, she crossed in an inner tube.  (*Id.*).

74.      She knew to leave for the Jackson ranch whenever she began to "feel bad."  (*Id.* at 79).

75.      Evangelina testified that Andrea Jackson was in the room for the birth of all of Evangelina's children.  (Dkt. No. 161 at 85).  She also inconsistently testified that Maurilio was either on the ranch for the births or in the delivery room.  (*Id.* at 81–89).  This contradicted Maurilio's testimony that he was in Mexico for some of the births.  (*Id.*).

76.      The only time Evangelina was not driven back to Mexico after giving birth was when either Gabriela or Jose Maurilio was born.  (Dkt. No. 160 at 79).  That time, she made it across the river in an inner tube with her child in her arms.  (*Id.*).

77.      When she would leave to give birth, Evangelina's older children would stay with her mother or mother-in-law, both of whom also lived in El Ejido.  (*Id.* at 81).

---

[6]      Evangelina was impeached at trial with prior testimony and a deposition where she failed to mention crossing the river in an inner tube.  (Dkt. No. 160 at 136–39).  The Parties also stipulated that "she was never asked if she crossed in an inner tube or she was never asked exactly how she crossed or described how she crossed and that, therefore, it was never mentioned."  (*Id.* at 138).

78.     Following each birth, Evangelina and Maurilio registered the children with the Mexican Civil Registry in Tamaulipas. (Dkt. No. 161 at 53–65). The Mexican birth certificates they received stated that they were all born in Mexico. (*Id.*); *see also* Section (I)(A).

79.     Evangelina stated that she has never tried to void Plaintiffs' Mexican birth certificates. (Dkt. No. 161 at 66).

80.     After Evangelina and Maurilio began working in the United States, they brought Plaintiffs and their siblings to the United States "to be together." (Dkt. No. 160 at 81–82).

81.     When Evangelina tried to enroll the children in school in the United States, she initially had trouble because they requested documents from her. (*Id.* at 85). Eventually, however, she was allowed to enroll her children without documents. (*Id.*).

82.     After this, Evangelina decided to have her children baptized. (*Id.*). They were baptized around a month after they were brought to the United States around 1981. (*Id.* at 95).

83.     She chose a Methodist church for the baptisms because that was the church she was attending at the time despite being Catholic. (*Id.* at 98).

84.     Once they were baptized, Andrea Jackson suggested that Evangelina obtain Texas birth certificates for her children. (*Id.* at 86). Evangelina stated that Andrea Jackson helped her fill out the forms necessary to obtain the birth certificates. (*Id.*).

85.     The only documents used to obtain the delayed Texas birth certificates were Plaintiffs' baptismal records and an affidavit from Evangelina stating that Plaintiffs were born in the United States. (*Id.* at 115).

86.     After obtaining Texas birth certificates Evangelina began receiving food stamps for her children after being told her children were entitled to them by an attorney. (*Id.* at 96, 99–100, 132).

87.     At some point, Evangelina received a letter stating that she was not entitled to food stamps and that she needed to go to court. (*Id.* at 102). An attorney was appointed to her, and she decided to plead guilty to the charges. (*Id.* at 102–03).

88.     Evangelina believed that she would have no more issues after pleading guilty. (*Id.* at 104–05). She stated that she did not believe that there would be any immigration consequences for her or her children if she pleaded guilty. (*Id.* at 105–06, 132–34).

89.     After pleading guilty, Evangelina was put on probation and required to pay restitution.  (*Id.* at 106).  Her probation was terminated early.  (*Id.* at 106–07).

a.     Testimony of Maurilio Lopez-Ornelas

90.     Maurilio testified that he was born in Michoacan, Mexico, and moved to the outskirts of Rio Bravo when he was three years old.  (Dkt. No. 159 at 6).

91.     He has three sisters and six or seven brothers.  (*Id.* at 7).

92.     When he was around 18–20 years old, he got married and built a home near the Rio Grande River next to his parents' house in Ejido, Rio Bravo.  (*Id.* at 7–8).  The house was made of wood and had no electricity or running water.  (*Id.* at 8).

93.     Maurilio's family knew the Jackson family in Donna, Texas, because his father was good friends with them.  (*Id.* at 9–10).

94.     He stated that the Jackson family home was around half a mile from the Rio Grande.  (*Id.* at 10).

95.     Maurilio's father would take him across the river to the Jacksons' home by putting him on his shoulders or by leading him by the hand.  (*Id.*).

96.     Maurilio crossed with his father this way until he learned how to swim.  (*Id.*).  When Maurilio was young the water level of the river was fairly high.  (*Id.* at 11).  His father sometimes had to swim across.  (*Id.*).

97.     Maurilio's father would cross the river to do work on another family's farm, but he never worked for the Jacksons.  (*Id.* at 11–12).  Maurilio would sometimes help take care of the Jacksons' cattle.  (*Id.* at 12).  He would do this irregularly and would get "paid" by receiving food.  (*Id.*).

98.     Maurilio married Evangelina in 1968 or 1969 when he was 20 years old.  (*Id.* at 14).

99.     The Jacksons would visit Maurilio's family in Rio Bravo by driving across a bridge in Donna, Texas.  (*Id.*).  They never crossed through the river.  (*Id.*).

100.     Maurilio denied that Yolanda Jackson ever crossed the river or played with him in Mexico as a child.  (*Id.* at 14–15).  He claimed to have only ever played with her on the U.S. side at the Jackson home.  (*Id.* at 15).

101.     Maurilio and his brothers would cross to the U.S. side to attend parties and religious activities like Easter baptisms along the banks of the river.  (*Id.* at 15–16).

11

102.    Maurilio testified that he is Catholic when in Mexico but would attend a Pentecostal church when in the United States.  (*Id.* at 16–17).

103.    He stated that the only reason Plaintiffs and their siblings were baptized was for the purpose of obtaining a delayed birth certificate.  (*Id.* at 17).

104.    When Evangelina first became pregnant, she and Maurilio decided the child should be born at the Jacksons' house because their house had electricity and running water and would be more welcoming.  (*Id.* at 19).  He also stated that they did not know anyone else well enough in Rio Bravo for Evangelina to give birth at their home.  (Dkt. No. 160 at 10).

105.    They also decided to pay a midwife from La Reforma to assist with the birth.  (Dkt. No. 159 at 19–20).  Maurilio was unsure whether the midwife helped with births back in Mexico.  (*Id.* at 20).  The midwife charged around 150 pesos.  (*Id.* at 21).  He remembered her name as Dona Elena.  (Dkt. No. 160 at 35).

106.    According to Maurilio, all of the other mothers in his neighborhood would give birth in their homes in Mexico.  (Dkt. No. 159 at 20).

107.    When the river was high, Maurilio would help Evangelina and the midwife across by placing them in inner tubes.  (*Id.* at 22).  When the river was low, Evangelina was able to walk by herself.  (*Id.*).  Maurilio would bring them across the river two to three days before each Plaintiff was born, when Evangelina began to experience "labor pains."  (Dkt. No. 160 at 45).

108.    Maurilio was never concerned about Evangelina floating away in the inner tube because he could handle the river current.  (Dkt. No. 159 at 27–28).

109.    Maurilio would carry luggage across the river for himself and Evangelina to change into after crossing the river.  (*Id.* at 27).

110.    After Plaintiffs and their siblings were born, Maurilio and Evangelina took them into Rio Bravo by wagon and horse to have them registered.  (*Id.* at 25).  Because their home was on lower ground and surrounded by dirt, it was difficult to take the horse and wagon when it rained because of mud.  (*Id.* at 25–26).

111.    After Evangelina gave birth, Maurilio would cross back into Mexico and have Andrea Jackson take Evangelina back into Mexico a few days later through the bridge.  (Dkt. No. 160 at 4–5).

112.    Sometimes, Evangelina would get back by walking through the river.  (*Id.* at 5).  Usually, she would not walk across the river with her children.  (*Id.* at 5).

113.    On at least one occasion, Maurilio remembered helping Evangelina and her children walk across the river.  (*Id.* at 5–6).

114.    Maurilio did not believe that there was an adequate place in Mexico for Evangelina to give birth that the family could afford.  (*Id.* at 10–11).  While there were doctors in Rio Bravo and neighbors with vehicles, Maurilio testified that the family could not afford either of these options when Plaintiffs were born.  (*Id.* at 61–62).

115.    Maurilio admitted to having children with women other than Evangelina, several of whom were born in Mexico and do not have United States birth certificates.  (*Id.* at 12–14, 30).  Several of these children were born in the United States and do not have Mexican birth certificates.  (*Id.* at 29).

116.    Maurilio inconsistently stated that he was not actually at the Jackson ranch for Plaintiffs' births and that he would stay outside at the ranch.  (*Id.* at 22–23, 46–50).  He claimed that he would help Evangelina and the midwife cross the river and then he would go back to Mexico.  (*Id.*).  He also inconsistently stated that he was at the ranch for Maria Cristina's birth and that he was in Mexico at the time.  (*Id.* at 23–24, 48).

117.    Maurilio stated that Plaintiffs' Mexican birth certificates were still valid and that he had never attempted to void them.  (*Id.* at 43).

### 3.    Testimony of Maria Cristina Lopez Perez

118.    Maria Cristina testified that the house her family lived in in Mexico was a 45-minute walk from the Rio Grande River.  (Dkt. No. 182 at 5–6).

119.    She would go down to the river often and learned how to swim from her father throwing her into the river.  (*Id.* at 6).  She claimed to be comfortable going into the river and never had any problems with it.  (*Id.* at 7).

120.    Her father would take her across the river occasionally by placing her onto his shoulders.  (*Id.*).

121.    Growing up she believed that she was born in Mexico because her parents never told her she was born in the United States.  (*Id.* at 8).

122.    Maria Cristina remembered her brother Jose Maurilio being brought home by her parents, but she did not know where he was brought from.  (*Id.* at 8–9).

123.    She remembered being left with her grandma who lived next to the family when her parents would leave town.  (*Id.* at 14).  A few days later her parents would return with a baby.  (*Id.*).

124. She stated that she was not in the room when any of her siblings were born. (*Id.* at 23).

125. She claimed that she first learned she was born in the United States at around 13 years old when she overheard her parents talk about moving the family there so the children could "learn about [their] country." (*Id.* at 9–11).

126. After the family moved to the United States, Maria Cristina claimed she was given a birth certificate that stated she was born in the United States. (*Id.* at 10–11).

127. Maria Cristina remembered visiting Rancho Viejo as a child. (*Id.* at 12). She would get there by walking across the river or having her father carry her on his shoulders. (*Id.*).

128. When the family moved to the United States, Maria Cristina remembered crossing the river to get there. (*Id.* at 15).

129. She admitted to pleading guilty to transporting marijuana across the U.S.-Mexican border as well as receiving a DWI. (*Id.* at 17–19).

### 4. Testimony of Apolonio Jackson, Jr.

130. Apolonio testified that he grew up at Rancho Viejo on the banks of the Rio Grande with his sister Yolanda. (Dkt. No. 188 at 8).

131. Growing up, Apolonio was responsible for caring for and taking the cattle out to graze along the riverbank. (*Id.* at 9–10).

132. He would take the cattle to the riverbank every day after school. (*Id.* at 11).

133. During this time, Apolonio would get into the river. (*Id.* at 12). According to him, the river was "two to three feet high" with a "pretty easy" current that was not difficult to handle. (*Id.* at 12, 15).

134. Sometimes, Apolonio would walk across the river to Mexico and "just sit on the other side of the bank and come back right over, you know, just for the fun of it." (*Id.* at 12).

135. When the river flooded, Apolonio would take the cattle up to a levee. (*Id.* at 13). Rancho Viejo is located between this levee and the river. (*Id.*).

136. A second smaller levee that ran all along the riverbank stood between the ranch and the river. (*Id.* at 13–14).

137. According to Apolonio, the river never flooded above the levee between the ranch and the river. (*Id.* at 14).

138.    Around the time Evangelina's children were born, Apolonio began to drink heavily.  (*Id.* at 21–22).

139.    During this time, he would sleep on the rear porch of the ranch in a bunk bed.  (*Id.* at 22).

140.    Apolonio remembered Maurilio and Evangelina coming to the ranch occasionally to help his mother.  (*Id.* at 24).  He also remembered them bringing their children along.  (*Id.* at 24–25).

141.    Maurilio stayed in "a little old shack" near the ranch's barn while Evangelina and the children stayed inside the house.  (*Id.* at 25).

142.    Apolonio was not sure how the family came to the ranch.  (*Id.* at 26).  He did not see them cross the river or take a car.  (*Id.* at 27).

143.    He believed Yolanda and Evangelina were close because he would hear Yolanda talk about Evangelina.  (*Id.* at 31).

144.    Apolonio stated that he did not remember any children being born at the ranch.  (*Id.* at 33).  He also stated, however, that he would not necessarily have known if a child had been born at the ranch.  (*Id.*).

145.    He did not recall a midwife ever coming to the ranch.  (*Id.* at 33–34).

### 5.    Testimony of Padinare Unnikrishna[7]

146.    Padinare Unnikrishna is the Chief of the Engineering Services Division of the U.S. International Boundary and Water Commission ("IBWC") in El Paso, Texas.  (Dkt. No. 213 at 7).

147.    Using the Hydraulic Engineering Center River Analysis System ("HEC-RAS"), Mr. Unnikrishna measured the minimum depth of the Rio Grande River on the dates of Plaintiffs' births.  (*Id.* at 12–14).  The measurements were taken at latitude 26°03'36.36"N and longitude 98°05'25.44"W.  (Dkt. No. 148-2 at 4).[8]

---

[7]    Mr. Unnikrishna was not qualified as an expert witness.  (*See* Dkt. No. 213 at 12).

[8]    There was some dispute at trial regarding whether the HEC-RAS measurements were taken at an approximation of where the crossings occurred or if they were taken at the Donna Bridge.  (Dkt. No. 213 at 40–45).  Because the coordinates listed on Mr. Unnikrishna's report are for a point in the river upstream from the bridge, the Court finds that the measurements were taken at an approximation of where Evangelina, Maurilio, and the midwife crossed when Plaintiffs were born.

148.    HEC-RAS is a public domain software that takes the survey cross-sections of each bank of the river and puts it into a computer model along with roughness coefficients to determine water surface elevations and velocities. (Dkt. No. 213 at 9).

149.    HEC-RAS is used by a variety of public and private entities including the Army Corps of Engineers and the Federal Emergency Management Agency. (*Id.* at 9–10).

150.    Mr. Unnikrishna used an existing IBWC hydraulic model for the Rio Grande that is from 2008. (*Id.* at 15). This model includes the topography of the river as it existed in 2008. (*Id.* at 34). Mr. Unnikrishna input flow data from Plaintiffs' birthdays into the 2008 model to determine the river's minimum depth, flow depth, flow velocities, and top width. (*Id.* at 15–16).

151.    There is no model that goes back to the time of Plaintiffs' births. (*Id.* at 34).

152.    The HEC-RAS model gave the following results:[9]

On February 12, 1969 (Plaintiff Maria Cristina's birthday), the minimum depth of the channel of the Rio Grande River where it borders the property of Andrea Jackson was 6.79 feet. (*Id.* at 17); (Dkt No. 148-2 at 4). One week beforehand, it was 6.79 feet. (Dkt. No. 213 at 21); (Dkt. No. 148-2 at 28). Two days beforehand, it was 7.67 feet. (Dkt. No. 213 at 21). Two days afterwards, it was 8.68 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 21).

On December 12, 1972 (Plaintiff Guadalupe's birthday), the minimum depth of the channel of the Rio Grande River where it borders the property of Andrea Jackson was 5.33 feet. (Dkt. No. 148-2 at 4); (Dkt. No. 213 at 18). Two days beforehand, it was 5.76 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 22). Two days afterwards, it was 5.34 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 22).

On November 2, 1973 (Plaintiff Juan Luis's birthday), the minimum depth of the channel of the Rio Grande River where it borders the property of Andrea Jackson was 9.26 feet. (Dkt. No. 148-2 at 5); (Dkt. No. 213 at 18). Two days beforehand, it was 13.48 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 22). Two days afterwards, it was 9.77 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 22).

On July 31, 1976 (Plaintiff Jose Maurilio's birthday), the minimum depth of the channel of the Rio Grande River where it borders the property of Andrea Jackson was 30.65 feet. (Dkt. No. 148-2 at 5); (Dkt. No. 213 at 19). Two days beforehand, it was 30.76 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 23). Two days afterwards, it was 31.35 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 23). Additionally, the

---

[9]    The HEC-RAS also gave results for August 3, 1975 (Angelica's birthday). (Dkt. No. 148-2).

minimum depth of the water in the flood plain on that date was 2.07 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 19–20). Two days beforehand, it was 2.18 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 23). Two days afterwards, it was 2.77 feet. (Dkt. No. 148-2 at 28); (Dkt. No. 213 at 23).

153.    On the dates of Plaintiffs' births, no weirs—concrete structures built across rivers that measure river flow at that location and can be used to increase flow depth upstream—were built where the HEC-RAS measured the river flows. (*Id.* at 31–32).

## II.    CONCLUSIONS OF LAW

Based upon the above findings of fact, the record, and arguments of counsel at the bench trial, the Court enters the following conclusions of law. Any conclusion of law that should be construed as a finding of fact is adopted as such.

### A.    LEGAL STANDARD

154.    The instant case is before this Court pursuant to 8 U.S.C. § 1252(b)(5)(B), which provides:

> If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of Title 28..

155.    In turn, 28 U.S.C. § 2201(a) provides, in relevant part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

156.    Once a case is transferred to a district court under 8 U.S.C. § 1252(b)(5)(B), review by the district court shall be *de novo* and that court will make a determination of citizenship using the same standard used in a declaratory judgment action where

Plaintiffs request the court declare them to be United States citizens. *See Vance v. Terrazas*, 444 U.S. 252, 256, 100 S.Ct. 540, 543, 62 L.Ed.2d 461 (1980).

157.   Under 28 U.S.C. § 2201, Plaintiffs have the burden of establishing their claim to United States citizenship by a preponderance of the evidence. *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 394 (5th Cir. 2006); *De Vargas v. Brownell*, 251 F.2d 869, 870–71 (5th Cir. 1958); *Reyes v. Neelly*, 264 F.2d 673, 674 (5th Cir. 1956).

158.   Proving a fact by a preponderance of the evidence means showing that the existence of the fact is more likely than not. *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1164 (5th Cir. 1993).

159.   There is no burden shifting analysis in such proceedings—that is, the burden does not shift to the Government to either produce evidence demonstrating that Plaintiffs were born outside the United States or discrediting all of Plaintiffs' evidence after they have demonstrated prima facie eligibility that they are United States nationals. *See Patel v. Rice*, 403 F.Supp.2d 560, 562 n.2 (N.D. Tex. 2005); *Pena-Sanchez v. Clinton*, No. 7:11-CV-00125, Dkt. No. 35, at 2 (S.D. Tex. March 28, 2013).

160.   "There are 'two sources of citizenship, and two only: birth and naturalization.'" *Miller v. Albright*, 523 U.S. 420, 423, 118 S.Ct. 1428, 1432, 140 L.Ed.2d 575 (1998) (quoting *United States v. Wong Kim Ark*, 169 U.S. 649, 702, 18 S.Ct. 456, 477, 42 L.Ed.2d 890 (1898)).

161.   The Court must "resolve all doubts [of citizenship] 'in favor of the United States and against' those seeking citizenship." *Bustamante-Barrera*, 447 F.3d at 394–95 (quoting *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637, 87 S.Ct. 666, 671, 17 L.Ed.2d 656 (1967)).

162.   The Court may not grant citizenship out of equity or in the interests of justice; rather, a person is a United States citizen only by the manners and means prescribed by Congress. *See I.N.S. v. Pangilinan*, 486 U.S. 875, 883–84, 108 S.Ct. 2210, 2216, 100 L.Ed.2d 882 (1988).

163.   Although not binding, federal regulations are instructive. *Trevino v. Pompeo*, No. 5:16-CV-00139, 2019 WL 13261429, at *8 (S.D. Tex. Sept. 13, 2019); *Rivera v. Albright*, No. 1:99-CV-00328, 2000 WL 1514075, at *1 (N.D. Ill. Oct. 11, 2000).

164.   The federal regulations outlining the requisite proof of citizenship for obtaining a passport—22 C.F.R. § 51.42(a–b)—state:

(a)   **Primary evidence of birth in the United States:** A person born in the United States generally must submit a birth certificate. The birth certificate must show the full name of the applicant, the applicant's place and date of birth, the full name of the parent(s), and must be signed by the official

custodian of birth records, bear the seal of the issuing office, and show a filing date within one year of the date of birth.

(b) **Secondary evidence of birth in the United States:** If the applicant cannot submit a birth certificate that meets the requirement of paragraph (a) of this section, he or she must submit secondary evidence sufficient to establish to the satisfaction of the Department that he or she was born in the United States. Secondary evidence includes but is not limited to hospital birth certificates, baptismal certificates, medical and school records, certificates of circumcision, other documentary evidence created shortly after birth but generally not more than 5 years after birth, and/or affidavits of persons having personal knowledge of the facts of the birth.

## B.   BIRTH CERTIFICATES

165.   A delayed birth certificate is entitled to less weight than a contemporaneously filed birth certificate. *See Liacakos v. Kennedy*, 195 F.Supp. 630, 631 (D.D.C. 1961) ("[A] record of birth contemporanceously [sic] made by governmental authority in official records would be almost conclusive evidence of birth."); *Beltran v. Rivera*, No. 2:10-CV-24288, 2012 WL 2675477, at *3 (S.D. Fla. July 6, 2012).

166.   A contemporaneously filed foreign birth certificate creates a presumption of alienage, although that presumption can be rebutted. *Rivera*, 2000 WL 1514075, at *3; *see also Beltran*, 2012 WL 2675477, at *3; *Sanchez v. Kerry*, No. 4:11-CV-02084, 2014 WL 2932275, at *4 (S.D. Tex. June 27, 2014), *aff'd,* 648 F.App'x 385 (5th Cir. 2015).

167.   The Fifth Circuit has not defined the boundaries for a contemporaneously filed birth certificate; however, courts in the Circuit have found birth certificates contemporaneous when filed anywhere from three days after birth to 54 days. *See Solis v. Rubio*, No. 7:22-CV-00232, 2025 WL 779693, at *3 (S.D. Tex. Mar. 12, 2025) (collecting cases).

168.   A delayed birth certificate, in contrast, is given little weight. *See Patel*, 403 F.Supp.2d at 564 (giving no evidentiary weight to a delayed birth certificate because plaintiff had failed to provide any documentary proof used to obtain the delayed birth record); *see also Rivera*, 2000 WL 1514075 at *3–4. Delayed baptismal records are also not persuasive evidence of birth. *United States v. Bukis*, 17 F.Supp. 77, 78 (E.D. Pa. 1936).

169.   Additionally, Delayed Texas Certificates of Birth are not irrefutable or conclusive evidence of birth in the United States. *See Pinto-Vidal v. Attorney General*, 680 F.Supp. 861, 862–63 (S.D. Tex. 1987); *De La Cruz v. Clinton*, No. 1:11-CV-00675, 2012 WL 1941373, at *4 (W.D. Tex. May 29, 2012). At best, a Delayed Texas Certificate of Birth is prima facie evidence, which is rebuttable, not conclusive. *Pinto-Vidal*, 680 F.Supp. at 862; *De La* Cruz, 2012 WL 1941373, at *4.

170.    Less evidentiary weight is given to a Delayed Texas Certificate of Birth where it was significantly predated by a Mexican birth registration.  *Solis*, 2025 WL 779693, at *4; *see also De La Cruz*, 2012 WL 1941373, at *3; *Beltran*, 2012 WL 2675477, at *3.

171.    The Court concludes that Plaintiffs' Delayed Texas Certificates of Birth and their baptismal records are not persuasive evidence of where they were born.  As an initial matter, all four Certificates were obtained in quick succession following Plaintiffs' baptisms in 1982.  This means that the Certificates and baptismal records are, at best, secondary non-contemporaneous evidence.  Moreover, both Evangelina and Maurilio admitted that Plaintiffs' Texas Delayed Certificates of Birth and baptismal records were obtained so that Plaintiffs could attend school in the United States, not to prove Plaintiffs' true citizenship.  While Evangelina also stated that the baptisms were a religious decision, it is clear from the record that the primary motivation was to allow Plaintiffs to attend school.  Plaintiffs were baptized in a Methodist church despite the family being Catholic and Maurilio testifying that he attended a Pentecostal church in the United States.

172.    Plaintiffs' Mexican birth certificates, while obtained closer to their births, are also less than persuasive.  First, the only Plaintiff whose Mexican birth certificate was obtained within a period previously recognized by a court as contemporaneous was Plaintiff Juan Luis's.  His was obtained 24 days after his birth.  The others range from 70 days (Maria Cristina) to 765 days (Jose Maurilio) after birth.  With the exception of Juan Luis's, the Court concludes that Plaintiffs' Mexican birth certificates were not filed contemporaneously with their births, and thus, are delayed birth certificates that do not create a presumption of alienage.

173.    Second, Evangelina and Maurilio did not obtain Mexican birth certificates for two of Plaintiffs' siblings, Angelica and Gabriela.  The Government does not contest that Angelica and Gabriela are United States citizens.  Essentially, this means that the Government disputes that Evangelina crossed the Rio Grande to give birth at the Jackson ranch to Plaintiffs but not to Angelica or Gabriela.  Were the Court to conclude that the Mexican birth certificates are credible evidence of Plaintiffs' nationality, the Court would have to accept that three of Plaintiffs' witnesses fabricated the story that all six of Evangelina and Maurilio's children were born in Donna, Texas, at the Jackson ranch.  The record does not contain enough evidence to convince the Court of this.

174.    Third, Evangelina testified—and the Court concludes—that she did not sign Plaintiffs Guadalupe, Juan Luis, and Jose Maurilio's Mexican birth certificates despite her name being signed on them. (Dkt. No. 161 at 50–64).  All of the signatures on the Mexican birth certificates seem to be signed by the same hand that filled out the rest of the certificate.  Moreover, Evangelina stated that it was her husband, not her, that took charge when the couple registered Plaintiffs in Mexico.  (Dkt. No. 160 at 142).  This, combined with Evangelina's lack of knowledge surrounding the registration of these certificates, (*see* Dkt. No. 161 at 50–64), undermines their credibility and rebuts the presumption of alienage as to Juan Luis.  Therefore, the Court concludes that Plaintiffs'

Mexican birth certificates, including Juan Luis's, are not reliable evidence of where they were born.

175.    The Court concludes that neither Plaintiffs' Mexican nor Texas birth certificates represent credible evidence of Plaintiffs' place of birth.  Because "the Court places equal weight on the Texas and Mexican Birth Certificates," they effectively "negate one another."  *Solis*, 2025 WL 779693, at *5.  Resolution of this case thus depends on the credibility of the witness testimony.

### C.    WITNESS CREDIBILITY

176.    The Court may also weigh the evidence and determine its veracity, which includes determining the credibility of the witnesses presented.  *See De Vargas*, 251 F.2d at 871.  A Plaintiff's self-serving statements and those of interested witnesses are "to be taken with a grain of salt."  *Id.*

177.    Nevertheless, a court may still find an interested witness credible if they present consistent and tenable testimony.  *See, e.g.*, *Solis,* 2025 WL 779693, at *4 (finding testimony of the plaintiff and his family to be credible despite "relatively-minor discrepancies" that were the result of "the passage of more than twenty years since Plaintiff's birth"); *Trejo v. Blinken*, No. 1:22-CV-00047, 2024 WL 2091356, at *4 (S.D. Tex. May 9, 2024) (finding that the plaintiff's mother and grandparents' testimony stating plaintiff was born in the United States was credible); *Flores v. Blinken*, No. 1:21-CV-00159, 2023 WL 2645536, at *5 (S.D. Tex. Mar. 27, 2023) (finding testimony of the plaintiff's parents to be credible because "they provided similar testimony and presented a tenable version of the events" surrounding the plaintiff's birth); *Garcia v. Limon*, 542 F.Supp.3d 577, 583–84 (S.D. Tex. 2021) (finding testimony from the plaintiff's relatives to be credible because it "was internally consistent and also corroborated the testimony of the other witnesses").

178.    All of Plaintiffs' witnesses, with the exception of Apolonio Jackson, Jr., are interested witnesses.  As Plaintiffs' parents, Evangelina and Maurilio are inherently interested.  Likewise, Maria Cristina is also interested given that she is a Plaintiff in this case.  Yolanda is also an interested witness given her close friendship as a child with Maurilio and her involvement in some of Plaintiffs' births.  Apolonio Jr., however, is a disinterested witness despite his family's relationship with Plaintiffs' family.  He testified that he had minimal interactions with Evangelina, Maurilio, or their children, and did not know much about why they visited the Jackson ranch.

179.    Plaintiffs' witnesses presented a plausible narrative for how Plaintiffs were born in the United States that could very well be true.  Evangelina, Maurilio, and Yolanda consistently testified that Evangelina would cross the Rio Grande into the United States to give birth to her children at the Jackson ranch in Donna, Texas.  This is a tenable explanation given that the family lived in a wooden home constructed by Maurilio

without any electricity or running water.  The witness testimony, however, contains various internal and external inconsistencies that undermine the veracity of this version of events.  The Court therefore cannot conclude from the testimony alone that Plaintiffs have met their burden of proving their United States citizenship.

180.  First, there is significant disagreement as to whether Maurilio was present at the ranch for Plaintiffs' births or if he was back in Mexico.  Yolanda first testified that Maurilio was at the ranch for all six births but later backtracked and claimed she was not sure whether he was at the ranch for the births or if he was in Mexico.  Evangelina contradicts this by stating that Maurilio was actually in the delivery room for several of the births (and on the ranch for the others).  Maurilio himself testified that he was in Mexico for Plaintiffs' births despite previously stating he was at the ranch for Maria Cristina's birth, blurring the truth even further.

181.  Second, their testimony is inconsistent regarding the midwife that helped with the births.  The witnesses—including Maurilio and Evangelina, who hired her—seemed to know very little about the midwife who allegedly helped birth all six children born at the Jackson ranch.  There was no clear answer as to how she traveled to the ranch, how she left and whether she traveled with Evangelina, how much she was paid, or even what her name was.  Some witnesses testified that her name was "Nina" or "Nena" while others claimed it was "Dona Elena."  Moreover, no one could state whether she was a registered midwife at all or if she assisted other mothers with childbirth.  The Court is unable to conclude from the testimony who this woman was or what role she played in Plaintiffs' births.

182.  Third, there was inconsistent testimony regarding how Evangelina, the midwife, and Plaintiffs would return to Mexico following the births.  Yolanda's testimony was not particularly helpful in this regard; she never saw Evangelina walk across the river back into Mexico and merely assumed that she did.  She also claimed that Evangelina would sometimes get a ride back but never stated who gave her those rides.  Evangelina stated that she was driven back to Mexico for four of her children's birth by Andrea Jackson's nephews and walked across the river for the other two (but could not remember which two).  Maurilio on the other hand, claimed that Evangelina would either be driven home by Andrea Jackson or would walk across the Rio Grande—sometimes with a child and sometimes without.  Again, these inconsistencies leave the Court unable to determine the veracity of the witnesses' accounts.

183.  Various other inconsistencies pervaded the testimony including whether Evangelina crossed the Rio Grande in an inner tube, (Dkt. No. 160 at 76–78, 136–39), whether Yolanda and Andrea Jackson slept in the room with Evangelina where she gave birth, (Dkt. No. 181 at 37–38); (Dkt. No. 160 at 75), how soon before giving birth Evangelina would leave for the Jackson ranch, (Dkt. No. 160 at 116); (Dkt. No. 161 at 81), and whether Andrea Jackson or someone else helped Evangelina fill out the forms to

acquire the Texas Delayed Certificates of birth, (Dkt. No. 160 at 86); (Dkt. No. 161 at 51–54).

184.    Evangelina's testimony has additional credibility issues.  Throughout her testimony, Evangelina contradicted herself and seemed to have trouble recalling many details surrounding the births of her children such as who was in the delivery and how she returned to her home in Mexico.  It is possible that this is due to the more than forty years between the births and her testimony instead of purposeful deceit.  It could also be a result of medication she was taking that affected her memory.  (*See* Dkt. No. 161 at 95–111); (Dkt. No. 214 at 50–56).  Regardless, her testimony undermines itself.  Although the Court accepts her statement that she did not understand that by pleading guilty to stealing food stamps she was admitting that her children were born in Mexico, the Court cannot find the rest of Evangelina's testimony to be credible.

185.    Apolonio Jr., despite being the only disinterested witness called by Plaintiffs, also lacks credibility.  The most glaring issue is his admission that he had been heavily drinking around the time of Plaintiffs' births. (Dkt. No. 188 at 21–22).  This makes it difficult for the Court to place much weight on his testimony.  Regardless, Apolonio Jr.'s testimony is not particularly probative of where Plaintiffs were born; he states that he saw Evangelina, Maurilio, and their children around the ranch but had no knowledge of children being born there.  (*Id.* at 33).  For this reason, the Court concludes that his testimony is not credible.

186.    The Court also concludes Maria Cristina's testimony is not credible.  She testified that she was left with her grandparents for each of her siblings' births and did not observe any of their births.  (Dkt. No. 182 at 14).  She had no personal knowledge of whether her parents traveled to the Jackson ranch and whether she or her siblings were born in the United States.  This makes her testimony less than reliable.  *See Rosales Rodriguez v. Blinken*, 683 F.Supp.3d 637, 640 (S.D. Tex. 2023) ("Testifying witnesses without personal knowledge about the subject of their testimony are generally less reliable than those with personal knowledge.").

187.    The Court also concludes that the Government's witness, Padinare Unnikrishna, while disinterested, was not credible.  He testified that he was able to determine river depths of the Rio Grande on each of Plaintiffs' birth dates by inputting data from those dates into the HEC-RAS model. (Dkt. No. 213 at 15).  However, the HEC-RAS model is based on the Rio Grande's topography as it existed in 2008, not on each of Plaintiffs' birthdays.  (*Id.* at 34).  He was not able to testify as to the Rio Grande's topography on Plaintiffs' birthdays.  (*Id.*).  As a result, the Court concludes that the minimum depths determined by the HEC-RAS model are, at minimum, irrelevant, and at most, inaccurate.  This is bolstered by the fact that Apolonio Jr. testified that the topography of the Jackson ranch had changed since Plaintiffs' births.  (*See* Dkt. No. 188 at 18) (noting that Exhibit 72 shows that much of the Jackson's land was now overgrown and that there used to be grass along the banks of the Rio Grande in that area).

188.    Given the credibility issues surrounding the witness testimony, the Court is unable to determine by a preponderance of the evidence where Plaintiffs were born. While many of the inconsistencies in the testimony are "relatively-minor discrepancies" resulting from "the passage of more than [forty] years since [Plaintiffs'] birth," *Solis*, 2025 WL 779693, at *4, the sheer number make it difficult for the Court to draw conclusions on Plaintiffs' place of birth.  This is compounded by a lack of reliable documentary evidence. Accordingly, the Court concludes that Plaintiffs have failed to prove that they were born in the United States, and therefore, have failed to meet their burden of proving that they are United States citizens.

## III.    CONCLUSION

Based on the foregoing, the Court finds as follows:

1.    Plaintiff Maria Cristina Lopez Perez has failed to prove by a preponderance of the evidence that she was born in the United States;

2.    Plaintiff Guadalupe Del Rosario Lopez Perez has failed to prove by a preponderance of the evidence that she was born in the United States;

3.    Plaintiff Juan Luis Lopez Perez has failed to prove by a preponderance of the evidence that he was born in the United States; and

4.    Plaintiff Jose Maurilio Lopez Perez has failed to prove by a preponderance of the evidence that he was born in the United States.

The Court will enter a separate final judgment to this effect.

It is SO ORDERED.

Signed on March 16, 2026.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

24